SKAPIK LAW GROUP
Mark J. Skapik (SBN 164957)
Geralyn L. Skapik (SBN 145055)
Blair J. Berkley (SBN 222293)
Matthew T. Falkenstein (SBN 333302)
5861 Pine Avenue, Suite A-1
Chino Hills, California 91709
Telephone:   (909) 398-4404
Facsimile:    (909) 398-1883
mskapik@skapiklaw.com, gskapik@skapiklaw.com
bberkley@skapiklaw.com, mfalkenstein@skapiklaw.com

Attorneys for Plaintiffs FELIX ESPINOZA and
ALYSSA J. GIBSON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| FELIX ESPINOZA, an individual and successor-in-interest to SIERRA ROSE VANATTA; ALYSSA J. GIBSON, an individual; and DOES 1 through 10,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF ORANGE; ANTHONY MAGDELENA, an individual; SHERIFF DON BARNES, an individual; CHAD TAYLOR, an individual; and Does 1 through 10,<br><br>Defendants. | Case:<br><br>**COMPLAINT FOR:**<br><br>1. Failure to Provide Medical Care [42 U.S.C. § 1983]<br>2. *Monell*—No hand-off or transfer process for hospital-patient transferees [42 U.S.C. § 1983]<br>3. *Monell*—No process for communicating medical needs across organizational boundaries [42 U.S.C. § 1983]<br>4. *Monell*—Policy of not conducting safety checks to monitor inmates with medical needs [42 U.S.C. § 1983]<br>5. State-created danger [42.U.S.C. § 1983]<br>6. Failure to properly classify [42 U.S.C. § 1983]<br>7. Failure to perform required safety checks [42 U.S.C. § 1983]<br>8. Failure to summon medical care [Cal. Government Code § 845.6]<br>9. Interference with familial relationship—Fourteenth Amendment [42 U.S.C. § 1983]<br>10. Interference with familial relationship—First Amendment [42 U.SC. § 1983]<br>11. Bane Act [Cal. Civil Code § 52.1] |

12. Wrongful death [C.C.P. § 377.60-377.62]

13. Survival action [C.C.P. § 377.30-377.34]

**DEMAND FOR JURY TRIAL**

---

Plaintiffs Felix Espinoza, successor-in-interest to Sierra Rose Vanatta, and Alyssa J. Gibson allege as follows:

**<u>PARTIES</u>**

1.     Plaintiff Felix Espinoza ("ESPINOZA") is an individual and resident of Orange County.

2.     ESPINOZA is father of decedent Sierra Rose Vanatta ("VANATTA"), successor-in-interest to VANATTA, and sole heir to VANATTA.  ESPINOZA filed a declaration and statement pursuant to California *Code of Civil Procedure* section 377.32.

3.     Alyssa Gibson ("GIBSON") is ESPINOZA's daughter and sister of VANATTA.

4.     Defendant County of Orange ("COUNTY") is a political subdivision of the State of California.

5.     Defendant Don Barnes ("BARNES") is the COUNTY Sheriff.

6.     Defendant Chad Taylor ("TAYLOR") is Commander of the Men's and Women's Central Jail at 44 Civic Center Plaza, Santa Ana (collectively "Central Jail").

7.     Defendant Anthony Magdelena ("MAGDELENA") is an Officer with the COUNTY Probation Department.

8.     Defendant DOES 1-5 are COUNTY Sheriff's deputies and custodial staff who worked in the regular-housing unit in Women's Central Jail where VANATTA was incarcerated from on or about December 30, 2023, through January 5, 2024.  Defendant DOES 6-10 are COUNTY Correctional Health Services staff members employed at the

Women's Central Jail.  When the true identities of DOES 1 through 10 are determined, this Complaint will be amended.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over Plaintiffs' Title 42, United States Code, section 1983 and 1988 claims pursuant to Title 28 U.S.C. sections 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims.

## PRESENTATION OF WRITTEN CLAIM

10.      On May 3, 2024, ESPINOZA and GIBSON served Claims Against the COUNTY ("Claims") pursuant to California *Government Code* sections 910-915.4.  On May 10, 2024, Plaintiffs' counsel received acknowledgements from the COUNTY Office of Risk Assessment that COUNTY received the Claims.  Plaintiffs' counsel has received no other communications from the COUNTY.

## GENERAL ALLEGATIONS

11.      Decedent VANATTA was born on December 20, 1995, in Mission Viejo, California.  Her parents are Plaintiff ESPINOZA and the late Joanna Marie Vanatta.  GIBSON is VANATTA's sister.

12.      VANATTA graduated from Junipero Serra High School in San Juan Capistrano and was employed as a child-care worker after graduation.

13.      She lived at 20111 Southwest Cypress Street in Newport Beach.

14.      VANATTA had been arrested in the past for driving on a suspended license and possession of a controlled substance (all misdemeanors).

15.      On April 15, 2023, VANATTA was arrested for driving without a license and possession of a controlled substance.  She was later convicted and sentenced to time served and put on probation.  Defendant MAGDELENA was her probation officer.

16.      VANATTA suffered hypertensive heart disease, and her health failed in 2023.  She required frequent blood transfusions.

17.      In late December 2023, VANATTA was admitted to Hoag Hospital (in Newport Beach) in critical condition and moved to the intensive care unit (ICU).

18.    VANATTA had a scheduled meeting with MAGDELENA at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

19.    Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting for her misdemeanor conviction.

20.    Instead of simply verifying VANATTA's health status with Hoag Hospital and re-scheduling the appointment, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's physicians and nurses told him that she was too ill to be moved.  Plaintiffs are informed and believe and thereon allege that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

21.    VANATTA could have been moved to, and accommodated in, the Hoag Hospital (Newport Beach) medical jail unit. VANATTA was not a flight risk and was on probation for a misdemeanor non-violent charge of driving without a license and drug possession.

22.    Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA forcibly removed VANATTA from Hoag Hospital against doctors' orders.  Though VANATA was in excruciating pain, MAGDELENA ignored her pleas and transported her in the back of his patrol car, to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

23.    Plaintiffs are informed and believe and thereon allege that VANATTA received no medical screening and no medical care at the Women's Central Jail.

24.    On January 5, 2024, five days (5-days) after MAGDELENA forcibly removed VANATTA from the doctors' care and medical treatment she was receiving from Hoag Hospital, she died of septic shock and pneumonia in a regular-housing unit at the Women's Central Jail.

///

# I.

## FIRST CAUSE OF ACTION

## <u>VIOLATION OF FOURTEENTH AMENDMENT—</u>

## <u>FAILURE TO PROVIDE MEDICAL CARE</u>

### [42 U.S.C. § 1983]

(By ESPINOZA as successor in interest Against DOES 1-10)

25.     Plaintiff incorporates by reference paragraphs 1-24 as though fully set forth herein.

26.     The Ninth Circuit has determined that individuals arrested for suspected parole violations are pretrial detainees subject to the Fourteenth Amendment. *Hanington v. Multnomah County*, 593 F.Supp.3d 1022, 1032 (D. Or. 2022).

27.     Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

28.     In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

29.     VANATTA had a scheduled meeting with her probation officer, Defendant MAGDELENA, at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

30.     Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting.

31.     Accordingly, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

32.    Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

33.    Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

34.    Plaintiff is further informed and believes and thereon alleges that, as a result of a prior incarceration, DOES 1-10 were aware of VANATTA's need for frequent blood transfusions.

35.    VANATTA had a constitutional right to necessary medical care while incarcerated in the Women's Central Jail.

36.    Nevertheless, DOES 6-10 made the intentional decision to not to return VANATTA to the hospital or place her in medical-unit housing and, instead, place her in a regular-housing unit where there is no capacity to monitor vital signs, service intravenous devices, or perform blood transfusions.

37.    Defendants' decision to house VANATTA in the regular-housing unit put VANATTA at substantial risk of suffering serious harm.

38.    DOES 1-10 did not take reasonable available measures meet VANATTA's health-care requirements and to abate the risk of her suffering serious harm, even though a reasonable official in the circumstances would have appreciated the high degree of risk involving in placing someone who was involuntarily removed from an intensive care unit into regular housing at Women's Central Jail—making the consequences of Defendants' conduct obvious.

39.    By not taking reasonable available measures to meet VANATTA's health-care requirements, Defendants caused VANATTA's death.

40.    In booking VANATTA at Women's Central Jail and deciding to place her in a regular-housing unit, Defendants acted under color of state law.

41. The conduct of DOES 1-10 was intentional, malicious, oppressive, and in reckless disregard of VANATTA's constitutional rights, health, and safety and, therefore, warrants the imposition of punitive and exemplary damages.

## II.

## SECOND CAUSE OF ACTION

## *MONELL*—NO HAND-OFF OR TRANSFER PROCESS FOR HOSPITAL-PATIENT TRANSFEREES

### [42 U.S.C. § 1983]

(By ESPINOZA as successor in interest Against COUNTY, BARNES and TAYLOR)

42. Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

43. Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

44. In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit. In the ICU she received three blood transfusions per day.

45. On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved. Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

46. Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

47. Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

48.     VANATTA had a constitutional right to necessary medical care while incarcerated in the Women's Central Jail.

49.     Nevertheless, VANATTA was not placed in the medical-unit housing and, instead, placed in a regular-housing unit where there is no capacity to monitor vital signs, service intravenous devices, or perform blood transfusions.

50.     VANATTA received no heart or blood-pressure monitoring, no medication and no transfusions while incarcerated at Women's Central Jail.  She developed sepsis that, as a proximate result of no medical monitoring, went undetected.  She died in a regular-housing unit on January 5, 2024, five days after being forced to leave her treating physicians and the medical care and treatment she was receiving from Hoag Hospital.

51.     The standard of care in the community requires that when the responsibility for hospital patient care is transferred from one attending physician to another attending physician, there is a *hand-off*.  A **hand-off** is an active process of passing patient-specific information from one caregiver to another, or from one team of caregivers to another, for the purpose of ensuring the continuity of the patient's care.

52.     The standard of care in the community requires that when a hospital patient is transferred from one hospital to another there is a *transfer*.  A **transfer** is an active process of conveying the responsibility for the care of a patient from one entity to another.  It includes the discharge from one hospital and the admission to another along with the patient's medical records.

53.     Defendant COUNTY's booking process at the Women's Central Jail includes **no provision** for a *hand-off* or *transfer* of hospital patients or records.

54.     Defendants BARNES and TAYLOR knew that arrestees and inmates were sometimes transferred to the Central Jail from in-patient hospital facilities, and that cursory medical screening alone in the booking process is inadequate to ensure the continuity of patient care.

55.    Plaintiff is informed and believes and thereon alleges that BARNES and TAYLOR knew that some arrestees and inmates transferred from in-patient hospital facilities to the Central Jail would, as proximate result of the absence of *hand-offs* and *transfers*, not receive the required medical care and coordination and, as a proximate result, suffer serious injuries.

56.    Nevertheless, BARNES and TAYLOR made the deliberate decision not to take any action to alter the booking process at the Central Jail to include a provision for *hand-offs* and *transfer* of hospital patients.

57.    BARNES and TAYLOR's policy was one of inaction—wait and see if a hospital-patient transferee dies.

58.    It was BARNES and TAYLOR's policy to keep a booking process that was obviously inadequate for hospital-patient transferees.

59.    Given the lack of a provision for *hand-offs* and *transfer* of hospital patients to the Central Jail, it was virtually certain that none of the hospital-patient transferees would receive the coordination of care required to ensure their health and safety.

60.    The need for a *hand-off* and *transfer* process in the booking of hospital-patient transferees to the Central Jail was so obvious that BARNES and TAYLOR's decision to take no action amounted to deliberate indifference to the constitutional rights of hospital-patient transferees to required medical care.

61.    Further, VANATTA's transfer from an intensive-care unit at Hoag Hospital made her intensive-care needs so obvious that to assign her to a regular-housing unit evidences a sadistic and deliberate indifference to her health and constitutional right to required medical care.

62.    BARNES and TAYLOR's deliberate decision to include no *hand-off* or *transfer* process in the Central Jail booking process was both the actual and proximate cause of VANATTA's death on January 5, 2024.

63.    *But for* the failure of Defendants to include a *hand-off* and *transfer* process in the Central Jail booking process, VANATTA would not have been placed in a

regular-housing unit where there is no capacity whatsoever to monitor vital signs, service intravenous devices, or perform blood transfusions. A *hand-off* from VANATTA's attending physician at Hoag Hospital to the COUNTY's physician would have resulted VANATTA's immediate transfer to a hospital. Every competent physician understands that one cannot be taken from an intensive-care unit and placed in a regular-housing unit.

64. It was also reasonably foreseeable that the failure to include a *hand-off* and *transfer* in the booking process for hospital-patient transfers would result in inadequate continuity of care to ensure VANATTA's health and safety.

65. As a proximate result of Defendants' policy of inaction, VANATTA died.

### III.

### THIRD CAUSE OF ACTION

### *MONELL*—NO PROCESS FOR COMMUNICATING MEDICAL NEEDS ACROSS ORGANIZATIONAL BOUNDARIES

### [42 U.S.C. § 1983]

(By ESPINOZA as successor in interest Against COUNTY, BARNES and TAYLOR)

66. Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

67. Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

68. In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit. In the ICU she received three blood transfusions per day.

69. On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved. Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

70.     Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

71.     Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

72.     Nevertheless, DOES 6-10 did not return VANATTA to the hospital or place her in medical-unit housing and instead caused VANATTA to be assigned to a regular-housing unit.

73.     VANATTA had a constitutional right to required medical care while incarcerated in the Women's Central Jail.

74.     VANATTA received no heart or blood-pressure monitoring and no transfusions while incarcerated at Women's Central Jail.  She developed sepsis and died in a regular-housing unit on January 5, 2024.

75.     In the Women's Central Jail, matters of health-care services are the sole province of the COUNTY Correctional Health Services ("CHS") staff.  Orange County Custody and Court Operations Manual, section 2100.3(b) states, "Matters of judgment regarding health care services will be the sole province of the health services staff." Accordingly, "All inmate medical files will be under the control of CHS."  Orange County Custody and Court Operations Manual, section 2110.4(b).

76.     At all times relevant, COUNTY had no process for CHS staff to communicate medical information obtained in the course of medical screening to the Sheriff's Department custodial staff when necessary for the protection of inmates' health and safety.

77.     Further, COUNTY had no process for Sheriff's Department custodial staff to directly communicate medical needs to CHS staff when deputies observe inmates who appear to require medical assistance.

78.     Also, COUNTY has no policies *requiring* CHS medical-screening staff to alert custodial staff to medical concerns for inmates assigned to the regular-housing units, and there are no policies *requiring* Sheriff's Department to communicate medical needs to CHS staff when deputies observe inmates who appear to require medical assistance.

79.     As a proximate result of the lack of a process for communication of medical needs across the organization boundaries of the Sheriff's Department and CHS, and a lack of policies *requiring* such communication, inmates with medical needs are regularly assigned to regular-housing units where the custodial staff have no knowledge of their medical needs.  When Sheriff's Department custodial staff members observe inmates who appear to require medical assistance, CHS is ordinarily not informed.

80.     Defendants BARNES and TAYLOR are aware that inmates with medical needs are regularly assigned to regular-housing units where their medical needs are unknown to custodial staff, and that the medical conditions of inmates can substantially deteriorate in regular-housing units when there is no communication between the Sheriff's Department and CHS regarding inmate medical needs.

81.     Nevertheless, BARNES and TAYLOR have maintained a policy of inaction and *not* changing processes and policies to permit and *require* the communication of medical needs across the organizational boundaries of the Sheriff's Department and Correctional Health Services.

82.     The likelihood that inmates suffer injuries when assigned to regular-housing units and their medical needs are not communicated to custodial staff (because there is no process and no policy requiring such communication) is so obvious that Defendants' policy of inaction amounts to deliberate indifference to inmates' medical needs.

83.     The likelihood that inmates suffer injuries in regular-housing units when their medical conditions deteriorate, and their medical needs are not communicated CHS staff (because there is no process and no policy requiring such communication) is

so obvious that Defendants' policy of inaction amounts to deliberate indifference to inmates' medical needs.

84.    Defendants' deliberate indifference to inmates' medical needs is also shown by lack of policies **requiring** the communication of medical needs across the organization boundaries of the Sheriff's Department and Custodial Health Services.

85.    Defendants' policy of inaction was both the actual and proximate cause of VANATTA's death. *But for* Defendants' policy of inaction and ***not*** changing processes and policies to facilitate and require communications from CHS medical screeners to Sheriff's Department custodial staff, the deputies at Women's Central Jail would have been aware that VANATTA came from an intensive-care unit and needed frequent blood transfusions. The deputies would have increased the frequency of their safety checks and noticed that VANATTA needed medical attention well before she went into septic shock and died.

86.    *But for* Defendants' policy of inaction and ***not*** changing processes and policies to facilitate and require communications from Sheriff's Department custodial staff to CHS when inmates have medical needs, CHS would have been alerted to VANATTA's deteriorating medical condition and could have ordered interventions to prevent her death from sepsis.

87.    Further, it is reasonably foreseeable that if CHS staff have no process to communicate medical alerts to custodial staff, and no policy requiring such communication, inmates with medical needs will not receive the required safety checks and suffer severe injuries or death.

88.    It is reasonably foreseeable that if Sheriff's Department custodial staff have no process to communicate medical needs to CHS, and no policy requiring such communication, inmates in the regular-housing units will suffer life-threatening conditions without the knowledge of CHS.

89.    As a proximate result of Defendants' policy of inaction, VANATTA died.
///

**IV.**

**FOURTH CAUSE OF ACTION**

*MONELL*—**POLICY OF NOT CONDUCTING SAFETY CHECKS TO MONITOR INMATES WITH MEDICAL NEEDS**

**[42 U.S.C. § 1983]**

(By ESPINOZA as successor in interest Against COUNTY, BARNES and TAYLOR)

90.    Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

91.    Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

92.    In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

93.    On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest.  When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

94.    Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

95.    Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

96.    VANATTA had a constitutional right to necessary medical care while incarcerated in the Women's Central Jail.

97.    VANATTA received no heart or blood-pressure monitoring and no transfusions while incarcerated at Women's Central Jail.  She developed sepsis that, as a proximate result of no medical monitoring, went undetected until it was irreversible. She died in a regular-housing unit on January 5, 2024.

98.    Periodic *safety checks* are essential to the overall safety and welfare of inmates, particularly those with medical concerns.  Title 15, California Code of Regulations, section 1006 defines *safety checks* to mean "direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of incarcerated people."

99.    Title 15, California Code of Regulations, section 1027.5 states:

(a) Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.

(b) There shall be no more than a 60-minute lapse between safety checks.
.
.
.
(e) There shall be a written plan that includes the ***documentation of all safety checks***.

15 *CCR* § 1027.5.

100.    Plaintiff is informed and believes and thereon alleges that Defendant COUNTY in the present case has a policy of ***not*** requiring periodic direct-visual safety checks in regular-housing units to observe inmates for their physical and medical needs, and a policy of ***not*** requiring documentation of safety checks.

101.    Defendants BARNES and TAYLOR are aware that, as a proximate result of COUNTY's policy of ***not*** requiring periodic direct-visual safety checks to observe inmates for their physical and medical needs, and as a proximate result of COUNTY's policy of ***not*** requiring documentation of safety checks, inmates in general-housing units go unresponsive and die or suffer severe injuries before their conditions are discovered.  (The general rule in health care is that if something is not documented, it is not performed.  In other words, the requirement of documentation ensures that the

underlying task is performed.)  Nevertheless, COUNTY has maintained a policy of inaction and *not* requiring periodic direct-visual safety checks to observe inmates for their physical and medical needs, and the policy of *not* requiring documentation of safety checks.

102.   As a proximate result of Defendants' policies, the custodial staff at Women's Central Jail do not make periodic safety checks to look for physical and medical needs.

103.   Defendants' decisions to maintain their policies of *not* requiring periodic direct-visual safety checks in regular-housing units, and *not* requiring documentation of safety checks, in light of state regulations and their knowledge of cases where inmates in general-housing units went unresponsive for prolonged periods and died or suffered severe injuries before their conditions were discovered, amounts to deliberate indifference to the medical needs of inmates.

104.   *But for* Defendants' decisions to maintain their policies of *not* requiring periodic direct-visual safety checks in regular-housing units, and to *not* require documentation of safety checks, VANATTA would have been checked every hour and someone would have noticed that *she looked bad* and was in severe medical distress. VANATTA died of sepsis on January 5, 2024, in a regular-housing unit.  Sepsis causes the major organs to be starved for oxygen and to shut down.  Patients in septic shock look *bad and are in excruciating pain.*  If a direct-visual safety check had been made on January 3 or 4, 2024, someone would have noticed VANATTA's appearance and medical interventions could have been taken to save her life.

105.   It is also reasonably foreseeable that if there is a policy of *not* requiring periodic direct-visual safety checks of inmates in regular-housing units, and a policy of *not* requiring the documentation of safety checks (so that the safety checks are actually performed), inmates in general-housing units will go unresponsive and remain undiscovered for long periods.

# V.

## FIFTH CAUSE OF ACTION

## <u>STATE-CREATED DANGER</u>

### [42. U.S.C. § 1983]

(By ESPINOZA, as successor in interest Against MAGDELENA and DOES 6-10)

106.   Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

107.   Decedent VANATTA had a Fourteenth Amendment right to be free from state-created dangers.

108.   VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

109.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

110.   VANATTA had a scheduled meeting with her probation officer, Defendant MAGDELENA, at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

111.   Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting.

112.   Accordingly, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

113.   Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

114.   As an actual and proximate result of MAGDELENA's affirmative conduct, VANATTA faced additional foreseeable dangers at the Women's Central Jail that she would not have otherwise faced at Hoag Hospital ICU because the Central Jail has no capacity to deliver the intensive care and frequent blood transfusions that VANATTA received at Hoag Hospital.  These foreseeable dangers included additional risks of infection, pneumonia, septic shock, heart failure, and respiratory failure.

115.   MAGDELENA was aware that VANATTA would not receive the care at Central Jail that she was receiving at Hoag Hospital ICU, and that the move to Central Jail would harm her health.  Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA out of the Hoag Hospital ICU and to the Women's Central Jail.

116.   MAGDELENA knew that something bad was going to happen to VANATTA at Women's Central Jail but ignored that risk and took her to Women's Central Jail anyway.

117.   MAGDELENA's decision to take VANATTA to the Women's Central Jail put her in a situation that was more dangerous than the one MAGDELENA found her in.

118.   MAGDELENA's actions were a substantial cause of VANATTA's death.

119.   In taking VANATTA out of Hoag Hospital and transporting her to Women's Central Jail, MAGDELENA acted under color of state law.

120.   Defendant DOES 6-10 are the employees of COUNTY Correctional Health Services who classified VANATTA at Women's Central Jail, performed a medical screening, and made the decision to house VANATTA in a regular-housing unit instead of sending her back to the hospital or housing her in a medical unit.

121.   DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

122. Plaintiff is further informed and believes and thereon alleges that, as a result of a prior incarceration, DOES 6-10 were aware of VANATTA's need for frequent blood transfusions.

123. Nevertheless, instead of sending VANATTA back to the hospital or housing her in a medical unit, DOES 6-10, with deliberate indifference to VANATTA's health, decided to house her in a regular-housing unit.

124. As an actual and proximate result of the affirmative conduct of DOES 6-10, VANATTA faced additional foreseeable dangers in the regular-housing unit that she would not have otherwise faced at Hoag Hospital ICU because a regular-housing unit has no capacity to deliver the intensive care and frequent blood transfusions that VANATTA received at Hoag Hospital. These foreseeable dangers included additional risks of infection, pneumonia, septic shock, heart failure, and respiratory failure.

125. DOES 6-10 were aware that VANATTA would not receive the care in a regular-housing unit that she was receiving at Hoag Hospital ICU, and that the move to a regular-housing unit would harm her health. Nevertheless, with deliberate indifference to VANATTA's health, DOES 6-10 made the decision to house VANATTA in a regular-housing unit.

126. DOES 6-10 knew that something bad was going to happen to VANATTA in the regular-housing unit, but ignored that risk and sent her to a regular-housing unit anyway.

127. The decision of DOES 6-10 to assign VANATTA to a regular-housing unit put her at substantial risk of suffering serious harm, and their actions were a substantial cause of her death. It was foreseeable that assigning an arrestee who had come from an intensive-care unit to a regular-housing unit would cause serious harm.

128. In performing VANATTA's medical screening at Women's Central Jail and deciding to house her in a regular-housing unit, DOES 6-10 acted under color of state law.

129.   The conduct of MAGDELENA and DOES 6-10 was intentional, malicious, oppressive, and in reckless disregard of VANATTA's constitutional rights, health, and safety and, therefore, warrants the imposition of punitive and exemplary damages.

**VI.**

**SIXTH CAUSE OF ACTION**

**<u>FAILURE TO PROPERLY CLASSIFY</u>**

**[42. U.S.C. § 1983]**

(By ESPINOZA, as successor in interest Against DOES 6-10)

130.   Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

131.   Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

132.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

133.   On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest.  When MAGDELENA arrived at Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved. Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

134.   MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

135.   Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

136.   VANATTA had a constitutional right to required medical care while incarcerated at Women's Central Jail.

137.    Nevertheless, with deliberate indifference to VANATTA's health, DOES 6-10 classified and placed VANATTA in a regular-housing unit instead of sending her back to the hospital or assigning her to medical-unit housing.

138.    DOES 6-10 were aware that in there is no capacity whatsoever in the regular-housing units to monitor vital signs, service intravenous devices, or perform blood transfusions, and that VANATTA's health would be seriously harmed.  DOES 6-10 decided to place VANATTA in a regular-housing unit anyway.

139.    It was foreseeable that VANATTA would not receive the medical care she required in a regular-housing unit and that her health would be seriously harmed.

140.    VANATTA received no heart or blood-pressure monitoring and no transfusions while incarcerated at Women's Central Jail.  She developed sepsis that, as a proximate result of no medical monitoring, went undetected until it was irreversible.

141.    As a proximate result of the acts and omissions of DOES 6-10, VANATTA died on January 5, 2024, of septic shock and pneumonia in a regular-housing unit.

142.    At all times, DOES 6-10 acted under the color of state law.

143.    The conduct of DOES 6-10 was willful, wanton, malicious, and done with an evil motive and intent and reckless disregard for the rights and safety of VANATTA and therefore warrants the imposition of exemplary and punitive damages.

## VII.
## SEVENTH CAUSE OF ACTION
## FAILURE TO PERFORM REQUIRED SAFETY CHECKS
### [42. U.S.C. § 1983]

(By ESPINOZA, as successor in interest Against DOES 1-5)

144.    Plaintiff incorporates by reference paragraphs 1-41 as though fully set forth herein.

145.    In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

146.   On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest.  When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

147.   Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

148.   Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

149.   VANATTA had a constitutional right to required medical care while incarcerated in the Women's Central Jail.  Nevertheless, DOES 6-10 classified and assigned VANATTA to a regular-housing unit.

150.   Periodic *safety checks* are essential to the overall safety and welfare of inmates, particularly those with medical concerns.  Title 15, California Code of Regulations, section 1006 defines *safety checks* to mean "direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of incarcerated people."

151.   Title 15, California Code of Regulations, section 1027.5 states:

(a) Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.

(b) There shall be no more than a 60-minute lapse between safety checks.
.
.
(e) There shall be a written plan that includes the documentation of all safety checks.

15 CCR § 1027.5.

152.   DOES 1-5 are Sheriff's deputies and custodial staff who worked in the regular-housing unit where VANATTA was incarcerated from on or about December 31, 2023, to January 5, 2024.

153.   Plaintiff is informed and believes and thereon alleges that DOES 6-10 informed DOES 1-5 of VANATTA's arrival from Hoag Hospital ICU, her medical and unstable condition, and her need for regular safety checks.

154.   Plaintiff is further informed and believes and thereon alleges that, as a result of VANATTA's prior incarceration, DOES 1-5 were aware of VANATTA's hypertensive heart disease and need for frequent blood transfusions.

155.   Plaintiff is further informed and believes and thereon alleges that DOES 1-5 knew that VANATTA's medical condition would decline, or that she might suffer a medical setback that could lead to serious injury or death if not timely detected.

156.   Nevertheless, with deliberate indifference to VANATTA's health, DOES 1-5 performed few or no direct, visual safety checks of VANATTA over the period December 31, 2023, to January 5, 2024, to check on her health and well-being.

157.   DOES 1-5 knew that something bad was going to happen to VANATTA if she was not monitored but ignored that risk and their obligation to perform safety checks approximately every 60 minutes.

158.   Plaintiff is informed and believes and thereon alleges that DOES 1-5 contend that medical monitoring is the responsibility of the Correctional Health Services staff members and not their (DOES 1-5) responsibility.

159.   It was foreseeable that VANATTA's health would decline in a general-housing unit, and that she would suffer serious injury or death if safety checks were not performed, and her declining condition was not detected.

160.   Indeed, VANATTA went into septic shock and her organs began to fail. She *looked bad* on January 3 and 4, 2024, but DOES 1-5 performed no direct, visual checks.  With recent advances in sepsis treatment, sepsis and even septic shock are now reversible.  But as a proximate result of the failure of DOES 1-5 to perform safety

checks, VANATTA's septic shock, organ failures, and pneumonia went undetected and led to death.

161.   At all times, DOES 1-5 acted under the color of state law.

162.   The acts and omissions of DOES 1-5 were willful, wanton, malicious, and done with an evil motive and intent and reckless disregard for the rights and safety of VANATTA and therefore warrants the imposition of exemplary and punitive damages.

## VIII.

## EIGHTH CAUSE OF ACTION

## FAILURE TO SUMMON MEDICAL CARE

### [Cal. Government Code § 845.6]

(By ESPINOZA, an individual, and as successor in interest to VANATTA, and GIBSON Against MAGDELENA, COUNTY, and DOES 1-10)

163.   Plaintiffs incorporate by reference paragraphs 1-41 as though fully set forth herein.

164.   Plaintiffs ESPINOZA and GIBSON assert this *Government Code* section 845.6 cause of action as successor-in-interest to VANATTA and pursuant to California *Code of Civil Procedure* section 377.60, the wrongful-death statute.

165.   Defendant MAGDELENA is an Officer with the COUNTY Probation Department.

166.   Defendant DOES 1-5 are COUNTY Sheriff's deputies and custodial staff who worked in the regular-housing unit where VANATTA was incarcerated from on or about December 31, 2023, to January 5, 2024.  DOES 6-10 are employees of the COUNTY Correctional Health Services staff who worked at the Women's Central Jail during the same time period.

167.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

168. On or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved. Plaintiffs are informed and believe and thereon allege that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

169. Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

170. MAGDELENA knew or had reason to know that VANATTA was in need of immediate and intensive medical care.

171. Nevertheless, when he arrived to the Women's Central Jail with VANATTA, he failed to take reasonable action to summon such immediate medical care.

172. MAGDELENA's failure to summon immediate medical care was a proximate cause of VANATTA's death.

173. As a further proximate result of MAGDELENA's failure to summon immediate medical care for VANATTA, Plaintiffs lost VANATTA's love, society, and companionship.

174. Plaintiffs are informed and believe and thereon allege that, as VANATTA went through the booking and medical-screening process at Women's Central Jail, DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day. DOES 6-10 knew or had reason to know that VANATTA was in need of immediate and intensive medical care.

175. Nevertheless, when VANATTA went through the booking and medical-screening process at Women's Central Jail, DOES 6-10 failed to take reasonable action to summon such immediate medical care.

176. The failure of DOES 6-10 to summon immediate medical care was a proximate cause of VANATTA's death.

177.   As a further proximate result of the failure of DOES 6-10 to summon immediate medical care for VANATTA, Plaintiffs lost VANATTA's love, society, and companionship.

178.   COUNTY is vicariously liable for the acts of its employees pursuant to *Government Code* section 815.2.

## IX.

## NINTH CAUSE OF ACTION

## <u>INTERFERENCE WITH FAMILIAL RELATIONSHIP-FOURTEENTH AMENDMENT</u>

### [42 U.S.C. § 1983]

(By ESPINOZA, as an individual, Against MAGDELENA and DOES 1-10)

179.   Plaintiff incorporates by reference paragraphs 1-178 as though fully set forth herein.

180.   Parents and children have a substantive due process right to a familial relationship free from unwarranted state interference.  *Hardwick v. County of Orange*, 980 F.3d 733, 740-41 (9th Cir. 2020).

181.   Deliberate indifference is the minimum standard of culpability necessary to maintain a section 1983 claim for interference with familial relationship in violation of the Fourteenth Amendment.

182.   An officer acts with deliberate indifference by disregarding a known or obvious consequence of their actions.  This entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.  *Scott v. Smith*, 109 F.4th 1215, 1228 (9th Cir. 2024).

183.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

184.   On or about December 31, 2023, Defendant MAGDELENA obtained a warrant for VANATTA's arrest.  When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

185.   Nevertheless, with deliberate indifference to VANATTA's health, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

186.   Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, Defendant DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

187.   Nevertheless, with deliberate indifference to VANATTA's health and safety, DOES did not return VANATTA to the hospital or place her in medical-unit housing.  DOES 6-10 instead caused VANATTA to be placed in a regular-housing unit where there is no capacity whatsoever to monitor vital signs, service intravenous devices, or perform blood transfusions.

188.   Further, with deliberate indifference to VANATTA's health, DOES 6-10 made no attempt to communicate with the Sheriff's Department custodal staff at VANATTA's regular-housing unit to alert them to VANATTA's medical needs, the fact that VANATTA was taken from an intensive-care unit, and her need for extra monitoring and safety checks.

189.   DOES 6-10 were aware of the likelihood that VANATTA would receive no monitoring or medical care in a regular-housing unit and that her condition would deteriorate.

190.   DOES 1-5, the COUNTY Sheriff's deputies and custodial staff who worked in the regular-housing unit where VANATTA's was incarcerated from on or

about December 31, 2023, to January 5, 2024, were aware from her prior incarcerations that she required frequent blood transfusions.

191.   With deliberate indifference to VANATTA's health and safety, DOES 1-5 made no effort to check that VANATTA received the blood transfusions she required, and operated under the principle that health monitoring at Women's Central Jail was the sole responsibility of the Correctional Health Services staff members.

192.   VANATTA developed sepsis in the Women's Central Jail and went into septic shock.  When her vital organs did not receive the required oxygen, her organs began to fail.  By January 3 and 4, 2024, VANATTA looked as if she was near death.

193.   Nevertheless, with deliberate indifference to VANATTA's health and safety, DOES 1-5 made no attempt to communicate VANATTA's medical needs to Correctional Health Services.  Given VANATTA's appearance, DOES 1-5 were aware of the substantial probability that without medical intervention, VANATTA would die. DOES 1-5 justified their indifference and inaction on the ground that health monitoring at Women's Central Jail was the sole responsibility of the Correctional Health Services staff members.

194.   As a proximate result of the acts and omissions of DOES 1-10, VANATTA died on January 5, 2024, of septic shock and pneumonia in a regular-housing unit.

195.   At all times relevant, DOES 1-10 acted under the color of state law.

196.   The conduct of Defendants MAGDELENA and DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and reckless disregard for the rights and safety of VANATTA and ESPINOSA and therefore warrants the imposition of exemplary and punitive damages.

///

///

# X.

## TENTH CAUSE OF ACTION

## INTERFERENCE WITH FAMILIAL RELATIONSHIP-

## FIRST AMENDMENT

### [42 U.S.C. § 1983]

### (By GIBSON Against MAGDELENA and DOES 1-10)

197.   Plaintiff incorporates by reference paragraphs 1-196 as though fully set forth herein.

198.   GIBSON has a right under the First Amendment of the United States Constitution to be free from unlawful state interference with her familial relationship with VANATTA.

199.   In *Roberts v. U.S. Jaycees*, 468 U.S. 609, the U.S. Supreme Court characterized the sorts of associations that warrant First Amendment protection from unjustified interference by the State:

> Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.  Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.  As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Roberts*, 468 U.S. at 621-22.

200.   Accordingly, the Ninth Circuit has recognized a First Amendment familial association claim where state actors' actions and policies constitute an unwarranted interference with a person's right to familial association.  *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001).

201.   In the present case, Plaintiff GIBSON and decedent VANATTA are have the same mother (the late Joanna Marie Vanatta) and biological father (Plaintiff ESPINOZA).  They have half brothers and sisters also fathered by ESPINOZA.

202.   ESPINOZA never married Joanna Marie Vanatta and never lived with GIBSON and VANATTA.

203.   Joanna Marie Vanatta died at age 53 in 2018.

204.   For these reasons, GIBSON and VANATTA have had to depend and rely on each other for most of their lives.  No two sisters could be closer or more committed to each other.

205.   GIBSON and VANATTA shared an intimate human relationship that presupposed deep attachments and commitments.  The two shared not only a special community of thoughts, experiences, and beliefs but also the distinctly personal aspects of their lives.

206.   As a result of Defendants' deliberate indifference and failure to provide required medical care to VANATTA, she died, thereby depriving GIBSON of her First Amendment constitutional rights and familial relationship with VANATTA.

207.   The conduct of Defendants MAGDELENA and DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and reckless disregard for the rights and safety of VANATTA and GIBSON and therefore warrants the imposition of exemplary and punitive damages.

## XI.

## ELEVENTH CAUSE OF ACTION

## BANE ACT

## [Cal. Civil Code § 52.1]

(By ESPINOZA as successor in interest Against MAGDELENA, COUNTY and DOES 1-10)

208.   Plaintiff incorporates by reference paragraphs 1-207 as though fully set forth herein.

209.   Decedent VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

COMPLAINT

210.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

211.   VANATTA had a scheduled meeting with her probation officer, Defendant MAGDELENA, at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

212.   Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting.

213.   Accordingly, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest. When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

214.   With deliberate indifference to VANATTA's health, and with the particular purpose of depriving VANATTA of her Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs, MAGDELENA took VANATTA to the Women's Central Jail in Santa Ana without the consent of VANATTA's attending physicians.

215.   Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process, DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

216.   Plaintiff is further informed and believes and thereon alleges that, as a result of a prior incarceration, DOES 1-10 were aware of VANATTA's need for frequent blood transfusions.

217.   VANATTA had a Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs.

218.   With deliberate indifference to VANATTA's health, and with the particular purpose of depriving VANATTA of her Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs, DOES 6-10 made the intentional decision to not to return VANATTA to the hospital or place her in medical-unit housing and, instead, place her in a regular-housing unit where there is no capacity to monitor vital signs, service intravenous devices, or perform blood transfusions.

219.   Defendants' decision to house VANATTA in the regular-housing unit put VANATTA at substantial risk of suffering serious harm.

220.   DOES 1-10 did not take reasonably available measures meet VANATTA's health-care requirements and to abate the risk of her suffering serious harm, even though a reasonable official in the circumstances would have appreciated the high degree of risk involving in placing someone who was involuntarily removed from an intensive care unit into regular housing at Women's Central Jail—making the consequences of Defendants' conduct obvious.

221.   By not taking reasonable available measures to meet VANATTA's health-care requirements, Defendants caused VANATTA's death.

222.   In booking VANATTA at Women's Central Jail and deciding to place her in a regular-housing unit without hospital care, Defendants acted under color of state law.

223.   The conduct of DOES 1-10 was intentional, malicious, oppressive, and in reckless disregard of VANATTA's constitutional rights, health, and safety and, therefore, warrants the imposition of punitive and exemplary damages.

224.   COUNTY is vicariously liable for the acts of MAGDELENA and DOES 1-10 pursuant to *Government Code* section 815.2.

///

///

COMPLAINT

# XII.

## TWELFTH CAUSE OF ACTION

## __WRONGFUL DEATH__

### [Cal. Code of Civil Procedure §§ 377.60-377.62]

(By ESPINOZA and GIBSON Against MAGDELENA, COUNTY and DOES 1-10)

225.    Plaintiffs incorporate by reference paragraphs 1-41 as though fully set forth herein.

226.    Plaintiff ESPINOZA and the late Joanna Marie Vanatta are VANATTA's parents.  Joanna Marie Vanatta died in 2018.  GIBSON is VANATTA's sister.

227.    As a proximate result of Defendants' negligence, VANATTA died on January 5, 2024, without issue and without spouse.

228.    ESPINOZA is VANATTA's sole heir.

229.    VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

230.    In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

231.    VANATTA had a scheduled meeting with her probation officer, Defendant MAGDELENA, at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

232.    Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting.

233.    Accordingly, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest.

234.    When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiffs are

informed and believe and thereon allege that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

235.  Nevertheless, MAGDELENA took custody of VANATTA and took her out of the Hoag Hospital ICU without the consent of VANATTA's attending physicians.  In so doing, MAGDELENA assumed a legal duty of care owed to VANATTA.

236.  When MAGDELENA arrived at Women's Central Jail with VANATTA, he negligently failed to summon immediate medical care in violation of *Government Code* section 845.6.

237.  Plaintiffs are informed and believe and thereon allege that when MAGDELENA booked VANATTA into the Women's Central Jail, he negligently failed to inform the booking staff that he had taken VANATTA out of the Hoag Hospital ICU.

238.  MAGDELENA's removal of VANATTA from the Hoag Hospital ICU without the consent of her attending physicians, his failure to summon immediate medical care when he arrived at Women's Central Jail, and his failure to inform the booking staff that he had taken VANATTA out of the Hoag Hospital ICU were each substantial causes of VANATTA's death on January 5, 2024.

239.  As employees of the COUNTY Correctional Health Services, DOES 6-10 owed the inmates of Women's Central Jail, including VANATTA, a legal duty of care.

240.  Plaintiffs are informed and believe and thereon allege that, as VANATTA went through the booking and medical-screening process at Women's Central Jail, DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

241.  Plaintiffs are further informed and believe and thereon allege that, as a result of a prior incarceration, DOES 6-10 were aware of VANATTA's need for frequent blood transfusions.

242.  Nevertheless, DOES 6-10 negligently decided to ***not*** to return VANATTA to the hospital or place her in a medical-unit housing and, instead, place her in a regular-

housing unit where there is no capacity to monitor vital signs, service intravenous devices, or perform blood transfusions.

243.   Further, DOES 6-10 negligently failed to alert the Sheriff's Department custody staff that VANATTA came from the Hoag Hospital ICU with significant medical needs and a need for more frequent and thorough safety checks.

244.   The decision of DOES 6-10 to place VANATTA in a regular-housing unit instead of medical-unit housing, and their failure to alert the Sheriff's Department custody staff of VANATTA's significant medical needs were proximate causes of VANATTA's death.

245.   DOES 1-5 are COUNTY Sheriff's deputies and custodial staff who worked in the regular-housing unit where VANATTA was incarcerated from on or about December 31, 2023, to January 5, 2024.

246.   DOES 1-5 owed the inmates of Women's Central Jail, including VANATTA, a legal duty of care.

247.   DOES 1-5 breached their legal duty of care when they negligently failed to notify COUNTY Correctional Health Services that VANATTA appeared to be dying on January 2-5, 2024.  In that time period, VANATTA went into septic shock and her vital organs began to fail for lack of oxygen.  A reasonable person would have concluded that she needed immediate medical care.

248.   The failure of DOES 1-5 to refer VANATTA to Correctional Health Services and failure to call 911 was a proximate cause of VANATTA's death on January 5, 2024.

249.   As a proximate result of the negligence of Defendants MAGDELENA and DOES 1-10, ESPINOZA and GIBSON suffered damages and pecuniary losses.

250.   COUNTY is vicariously liable for the acts of MAGDELENA and DOES 1-10 pursuant to *Government Code* section 815.2.

# XIII.

## THIRTEENTH CAUSE OF ACTION

## SURVIVAL ACTION

### [Cal. Code of Civil Procedure §§ 377.30-377.34]

(By ESPINOZA, as successor in interest Against MAGDELENA, COUNTY and DOES 1-10)

251.   Plaintiff incorporates by reference paragraphs 1-41, 225-250 as though fully set forth herein.

252.   Plaintiff ESPINOZA is the father and successor-in-interest to the decedent, VANATTA.

253.   Plaintiff ESPINOZA and the late Joanna Marie Vanatta are VANATTA's parents.  Joanna Marie Vanatta died in 2018.

254.   ESPINOZA is VANATTA's sole heir.

255.   VANATTA suffered hypertensive heart disease and required frequent blood transfusions.

256.   In late December 2023, VANATTA was admitted to Hoag Hospital in Newport Beach in critical condition and moved to the intensive care unit.  In the ICU she received three blood transfusions per day.

257.   VANATTA had a scheduled meeting with her probation officer, Defendant MAGDELENA, at the end of December 2023.  Her boyfriend, Andrew Flour, telephoned MAGDELENA and informed him that she was in the Hoag Hospital ICU and would not be able to appear for her meeting.

258.   Nevertheless, MAGDELENA was upset that VANATTA did not appear for her probation meeting.

259.   Accordingly, on or about December 31, 2023, MAGDELENA obtained a warrant for VANATTA's arrest.

260.   When MAGDELENA arrived at the Hoag Hospital ICU, VANATTA's attending physicians and nurses told him that she was too ill to be moved.  Plaintiff is

COMPLAINT

informed and believes and thereon alleges that VANATTA's attending physicians did not discharge her from Hoag Hospital ICU.

261.  Nevertheless, MAGDELENA negligently, or with a reckless disregard of VANATTA's health and her constitutional right to required medical care while incarcerated, took custody of VANATTA and took her out of the Hoag Hospital ICU without the consent of VANATTA's attending physicians.  Is so doing, MAGDELENA assumed a legal duty of care owed to VANATTA.

262.  When MAGDELENA arrived at Women's Central Jail with VANATTA, he negligently, or with a reckless disregard of VANATTA's health, failed to summon immediate medical care in violation of *Government Code* section 845.6.

263.  Further, when he booked VANATTA into the Women's Central Jail, MAGDELENA negligently, or with a reckless disregard of VANATTA's health, failed to inform the booking staff that he had taken VANATTA out of the Hoag Hospital ICU.

264.  MAGDELENA's removal of VANATTA out of the Hoag Hospital ICU without the consent of her attending physicians, his failure to summon immediate medical care when he arrived at Women's Central Jail, and his failure to inform the booking staff that he had taken VANATTA out of the Hoag Hospital ICU were each proximate causes of VANATTA's death on January 5, 2024.

265.  As employees of the COUNTY Correctional Health Services, DOES 6-10 owed the inmates of Women's Central Jail, including VANATTA, a legal duty of care.

266.  Plaintiff is informed and believes and thereon alleges that, as VANATTA went through the booking and medical-screening process at Women's Central Jail, DOES 6-10 learned that VANATTA had been in the Hoag Hospital ICU, was in critical condition, and was receiving three blood transfusions per day.

267.  Plaintiff is further informed and believes and thereon alleges that, as a result of a prior incarceration, DOES 6-10 were aware of VANATTA's need for frequent blood transfusions.

268.   Nevertheless, DOES 6-10 negligently, or with a reckless disregard of VANATTA's health and her constitutional right to necessary medical care while incarcerated, decided to ***not*** to return VANATTA to the hospital or to place her in medical-unit housing and, instead, placed her in a regular-housing unit where there is no capacity to monitor vital signs, service intravenous devices, or perform blood transfusions.

269.   Further, DOES 6-10 negligently, or with a reckless disregard of VANATTA's health, failed to alert the Sheriff's Department custody staff that VANATTA came from the Hoag Hospital ICU with significant medical needs and a need for more frequent and thorough safety checks.

270.   The decision of DOES 6-10 to place VANATTA in a regular-housing unit instead of medical-unit housing, and their failure to alert the Sheriff's Department custody staff of VANATTA's significant medical needs were proximate causes of VANATTA's death.

271.   DOES 1-5 are COUNTY Sheriff's deputies and custodial staff who worked in the regular-housing unit where VANATTA was incarcerated from on or about December 31, 2023, to January 5, 2024.

272.   DOES 1-5 owed the inmates of Women's Central Jail, including VANATTA, a legal duty of care.

273.   DOES 1-5 breached their legal duty of care when, they negligently, or with a reckless disregard of VANATTA's health, failed to notify COUNTY Correctional Health Services that VANATTA appeared to be dying on January 2-5, 2024.  In that time period, VANATTA went into septic shock and her vital organs began to fail for lack of oxygen.  A reasonable person would have concluded that she needed immediate medical care.

274.   The failure of DOES 1-5 to refer VANATTA to Correctional Health Services and failure to call 911 was a proximate cause of VANATTA's death on January 5, 2024.

275.  As a proximate result of the negligence or reckless conduct of Defendants MAGDELENA and DOES 1-10, VANATTA suffered severe pain.

276.  The conduct and omissions of Defendants MAGDELENA and DOES 1-10 was malicious, oppressive, and in reckless disregard of VANATTA's health and constitutional rights and, therefore, warrants the imposition of punitive and exemplary damages against MAGDELENA and DOES 1-10.

277.  COUNTY is vicariously liable for the acts of MAGDELENA and DOES 1-10 pursuant to *Government Code* section 815.2.

THEREFORE, Plaintiffs pray for judgment against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION (FAILURE TO PROVIDE MEDICAL CARE [42 U.S.C. § 1983])**

1.  For general and special damages;

2.  For exemplary and punitive damages;

3.  For attorney fees pursuant to 42 U.S.C. § 1988;

4.  For costs of suit; and

5.  For such other and further relief as the court may deem proper.

**ON THE SECOND CAUSE OF ACTION (*MONELL*—NO HAND-OFF OR TRANSFER PROCESS FOR HOSPITAL-PATIENT TRANSFEREES [42 U.S.C. § 1983])**

6.  For general and special damages;

7.  For attorney fees pursuant to 42 U.S.C. § 1988;

8.  For costs of suit; and

9.  For such other and further relief as the court may deem proper.

**ON THE THIRD CAUSE OF ACTION (*MONELL*—NO PROCESS FOR COMMUNICATING MEDICAL NEEDS ACROSS ORGANIZATIONAL BOUNDARIES [42 U.S.C. § 1983])**

10.  For general and special damages;

11.  For attorney fees pursuant to 42 U.S.C. § 1988;

COMPLAINT

12.    For costs of suit; and

13.    For such other and further relief as the court may deem proper.

**ON THE FOURTH CAUSE OF ACTION (*MONELL*—POLICY OF NOT CONDUCTING SAFETY CHECKS TO MONITOR INMATES WITH MEDICAL NEEDS [42 U.S.C. § 1983])**

14.    For general and special damages;

15.    For attorney fees pursuant to 42 U.S.C. § 1988;

16.    For costs of suit; and

17.    For such other and further relief as the court may deem proper.

**ON THE FIFTH CAUSE OF ACTION (STATE-CAUSED DANGER [42 U.S.C. § 1983])**

18.    For general and special damages;

19.    For exemplary and punitive damages;

20.    For attorney fees pursuant to 42 U.S.C. § 1988;

21.    For costs of suit; and

22.    For such other and further relief as the court may deem proper.

**ON THE SIXTH CAUSE OF ACTION (FAILURE TO PROPERLY CLASSIFY [42 U.S.C. § 1983])**

23.    For general and special damages;

24.    For exemplary and punitive damages;

25.    For attorney fees pursuant to 42 U.S.C. § 1988;

26.    For costs of suit; and

27.    For such other and further relief as the court may deem proper.

**ON THE SEVENTH CAUSE OF ACTION (FAILURE TO PERFORM REQUIRED SAFETY CHECKS [42 U.S.C. § 1983]**

28.    For general and special damages;

29.    For exemplary and punitive damages;

30.    For attorney fees pursuant to 42 U.S.C. § 1988;

COMPLAINT

31.    For costs of suit; and

32.    For such other and further relief as the court may deem proper.

**ON THE EIGHTH CAUSE OF ACTION (FAILURE TO SUMMON MEDICAL CARE [CAL. GOVERNMENT CODE § 845.6])**

33.    For general and special damages;

34.    For costs of suit; and

35.    For such other and further relief as the court may deem proper.

**ON THE NINTH CAUSE OF ACTION (INTERFERENCE WITH FAMILIAL RELATIONSHIP—FOURTEENTH AMENDMENT [42 U.S.C. § 1983])**

36.    For general and special damages;

37.    For exemplary and punitive damages;

38.    For attorney fees pursuant to 42 U.S.C. § 1988;

39.    For costs of suit; and

40.    For such other and further relief as the court may deem proper.

**ON THE TENTH CAUSE OF ACTION (INTERFERENCE WITH FAMILIAL RELATIONSHIP—FIRST AMENDMENT [42 U.S.C. § 1983])**

41.    For general and special damages;

42.    For exemplary and punitive damages;

43.    For attorney fees pursuant to 42 U.S.C. § 1988;

44.    For costs of suit; and

45.    For such other and further relief as the court may deem proper.

**ON THE ELEVENTH CAUSE OF ACTION (BANE ACT [CAL. CIVIL CODE § 52.1])**

46.    For statutory damages;

47.    For exemplary and punitive damages;

48.    For attorney fees pursuant to *Civil Code* § 52.1(i);

49.    For costs of suit; and

50.    For such other and further relief as the court may deem proper.

**ON THE TWELFTH CAUSE OF ACTION (WRONGFUL DEATH)**

      51.    For compensatory damages;

      52.    For costs of suit; and

      53.    For such other and further relief as the court may deem proper.

**ON THE THIRTEENTH CAUSE OF ACTION (SURVIVAL ACTION)**

      54.    For general damages for pre-death pain and suffering pursuant to *C.C.P.* § 377.34(c)(3);

      55.    For exemplary and punitive damages pursuant to *C.C.P.* § 377.34(a);

      56.    For costs of suit; and

      57.    For such other and further relief as the court may deem proper.


                        SKAPIK LAW GROUP


Dated: September 30, 2024        By:   */s/ Geralyn L. Skapik*
                                  Geralyn L. Skapik
                                  Mark J. Skapik
                                  Blair J. Berkley
                                  Attorneys for Plaintiffs

COMPLAINT

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands trial by jury.


SKAPIK LAW GROUP


Dated: September 30, 2024          By:     **<u>/s/ Geralyn L. Skapik</u>**
Geralyn L. Skapik
Mark J. Skapik
Blair J. Berkley
Attorneys for Plaintiffs